**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FRANCESCO CAVALIERE,<br>Derivatively and on Behalf<br>of Altair Nanotechnologies, Inc.,   :<br><br>       Plaintiff,   :<br><br>  v.   :<br><br>JAMES T. ZAHN, GUOHUA SUN,<br>YINGCANG WEI, JUN LIU,<br>CHING CHUEN CHAN, GUOHUA<br>WEI, CANON INVESTMENT<br>HOLDINGS, INC.,   :<br><br>       Defendants,   :<br><br>  -and-   :<br><br>ALTAIR NANOTECHNOLOGIES, INC.,   :<br><br>       Nominal Defendant. | **14 CV     9418**<br>Case No.<br><br><br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff FRANCESCO CAVALIERE, by and through his undersigned attorneys, brings this derivative complaint (the "Complaint") for the benefit of nominal defendant, Altair Nanotechnologies, Inc. ("Altair" or the "Company"), against members of its Board of Directors seeking to remedy defendants' breaches of fiduciary duties and abuse of control.

### NATURE AND SUMMARY OF THE ACTION

1.      Nominal Defendant Altair is a Delaware corporation with its principal place of business at 204 Edison Way, Reno, Nevada.  Altair develops, manufactures, and sells nano lithium titanate batteries and energy storage systems.  Altair common stock is publicly traded on the NASDAQ with ticker "ALTI."  Altair currently has one wholly owned subsidiary, Altair US

Holdings, Inc., a Nevada corporation. Altair US Holdings, Inc. directly or indirectly wholly owns Altairnano, Inc., a Nevada corporation. In 2012 the Company launched operations in China and for that purpose Altairnano, Inc. formed a wholly owned subsidiary named Altair Nanotechnologies Co., Ltd., a Wholly Foreign Owned Enterprise in China ("Altair China"); Altair China directly wholly owns Northern Altair Nanotechnologies Co., Ltd., a domestic company in China. Although launching operations in China, Altair failed to implement adequate procedures and controls regarding its communication with its foreign operations in China.

2.      Altair securities trades on the NASDAQ Capital Market between, and including May 15, 2013 and September 4, 2014 (the "Relevant Time Period"), during which time Defendants made materially false and misleading statements and/or omitted material facts regarding the dysfunction of Altair's business, operational and compliance policies, and internal controls that dealt with financial reports. Altair failed to disclose its failure to integrate its new China based operations with its existing U.S. management, executive and management level turnover and the non-functioning of basic corporate controls and financial reporting during 2013. Altair failed to inform investors that by failing to created controls over its China based new operations or integrating its U.S. based financial control personnel with its China operations, the Company lost control over financial information leading to an ongoing systemic failure to record and report and perform timely reviews of transactions with a reasonable level of precision. The Company did and, as a result, failed to implement adequate procedures and controls to ensure the completeness and accuracy of consolidated financial statements and related subsequent events.

3.      On September 4, 2014, the Company filed a Form 8-K with the SEC announcing that on August 28, 2014, Crowe Horwath LLP ("Crowe"), the independent registered public accounting firm of Altair had resigned due to its inability to complete the 2013 audit because of

the Company's failure to provide Crowe with sufficient financial information from the Company's operations in China. Otherwise stated, Crowe indicated that it was resigning due to the Company's failure to establish timely and accurate communication between the China subsidiary and the United States managerial team.

4.      As a result of this disclosure, NASDAQ halted Altair's shares during the trading day on September 4, 2014 at $4.30 per share. Altair shares resumed trading on September 24, 2014, 20 days after it was initially taken off the market. Because of the news, Altair shares fell $3.35 per share, and closed at $0.95. During the Relevant Time Period, Altair shares dropped nearly 90% in value, from a closing of $7.99 on October 14, 2013 to a closing price of $0.95 on September 24, 2014.

5.      As a result of the Defendant's wrongful acts of releasing untrue statements or omissions, Altair stock value plummeted, causing Plaintiff and other Class members to suffer significant monetary losses.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

7.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' participation in the wrongful acts detailed herein, occurred in this district. Due to the nexus between the wrongful acts complained of herein and this district, a Section 10(b) of the Securities Exchange Act of 1934 actions (David Helfendbein vs. Altair Nanotechnologies, Inc., et al., 14 CV 7828) has been filed in this Court.

The present action claims, in part, damages resulting from that action.

8.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate Commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

### Plaintiff

9.     Plaintiff FRANCESCO CAVALIERE is and has been continuously throughout all relevant times the owner of Altair shares during the Relevant Time Period.

### Defendants

10.     Defendant Altair is described above in paragraphs 1 and 2.

11.     Defendant James T. Zhan ("Zhan") is and has been the CEO of the Company since his appointment on August 15, 2014.  Zhan has been a member of the Board of Directors since his appointment on September 12, 2014.

12.     Defendant Guohua Sun ("Sun") is and has been a member of the Board of Directors since July 2011.  Sun served as interim CEO for the Company from March 18, 2014 until August 13, 2014. Sun has served as the general manager of Canon Investment Holdings, Inc. ("Canon," herein).  Sun was appointed to the Board pursuant to a covenant in an agreement between the Company and Canon.

13.     Defendant Yincang Wei ("Y. Wei") is and has been a member of the Board of Directors since his appointment July 22, 2011.  He is and has served as the chairman of Canon. Y. Wei was appointed to the Board pursuant to a covenant in an agreement between the Company and Canon.

14.     Defendant Jun Liu ("Liu") is and has been a member of the Board of Directors since July 2011.   Liu was appointed to the Board pursuant to a covenant in an agreement between the Company and Canon.

15.     Dr. Ching Chuen Chan ("Chan") is and has been a member of the Board of Directors since November 28, 2012.

16.     Defendant Guohua Wei ("G. Wei") is and has been a member of the Board of Directors for Altair since his appointment on September 26, 2013 following the resignations of Liming Zou, Director Sze, and Director Guo as directors of Altair.   G. Wei's principal employment is Legal Representative and Executive Director of the Company's (Altair's) indirect subsidiaries in China.   G. Wei is head of administrative department of Canon.   G. Wei was appointed to the Board pursuant to a covenant in an agreement between the Company and Canon.

17.     The defendants identified in ¶¶ 11 - 16, above, are collectively referred to as the "Director Defendants" or "Defendants."

18.     Defendant Canon Investment Holdings Limited ("Canon") is a Hong Kong Corporation.   Canon and its affiliates own a majority of the shares of Altair.   According to Altair's Definitive 14A Proxy Statement dated October 25, 2013, the last proxy filed by Altair, Canon is the beneficial owner of 53.26% or 6,172,801 shares of Altair common stock.

## SUBSTANTIVE ALLEGATIONS

19.     The Company failed to implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, the Company failed to detect the material misstatements that were identified by Crowe during its audit process.

20.     On May 15, 2013, the Company filed a Form 8-K with the SEC that announced

its operating and financial results for the first quarter ending March 13, 2013, and issued a press release entitled "Altair Nanotechnologies Reports First Quarter 2013 Financial Results."

21.     In the press release, Altair reported revenues of $1.9 million for the first quarter compared to $0.3 million for the same period in 2012.  The gross loss was $0.3 million due to inventory cost adjustments and the launching of new electric grid products.  Operating expenses were $3.2 million for the first quarter, a $1.6 million decrease from $4.8 million for the same period in 2012.  Planned reductions were achieved and accounted for the decrease of $1.6 million in the research and development, sales and marketing, and general and administrative departments.  The net loss for the first quarter of 2013 was $3.4 million ($0.29 per share) compared to a net loss of $4.9 million ($0.42 per share) for the same period in 2012.  In the press release, the Company stated,

> 'Our goal in 2012 was to advance our commercialization efforts, reduce cost and position the company for growth,' stated Alexander Lee, Altair's Chief Executive Officer.  'Thus far in 2013, we can tangibly point to our achievements in each of these areas. We delivered a number of systems to our customers, who are impressed with our team and our products. We reduced our operating expenses this past quarter by 33% as compared to the same period last year. Moreover, we achieved this milestone, while we were ramping up our China operations. We have approximately 30 employees in China, and have made significant progress on the construction of our new manufacturing and assembly facilities. With respect to the critical issue of revenue, we recognized $1.9 million in revenue this quarter, and now have $7.1 million in deferred revenue. Lastly, when we add in the revenue that we expect to earn from our current customer base, which includes the Hawaii Natural Energy Institute, Proterra and the City of Wu'an, it quickly becomes clear why 2013 will be a pivotal year for Altair.'

22.     On May 15, 2013, the Company also filed a form 10-Q with the SEC, which stated the following,

**Controls and Procedures**

(a)     Based on their evaluation as of March 31, 2013, which is the end of the period covered by this Quarterly Report on Form 10-Q, our principal executive officer and principal financial officer have concluded that our disclosure controls

and procedures (as defined in Rules 13a-15(e) or 15d-15(e) of the Exchange Act) are effective, based upon an evaluation of those controls and procedures required by paragraph (b) of Rule 13a-15 or Rule 15d-15 of the Exchange.

(b)     There have been no changes in our internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of Exchange Act Rules 13a-15 or 15d-15 that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

23.     On August 8, 2013 the Company issues a press release, stating as follows:

Sixteen months ago, we put into action our plan to position the company for growth, reduce costs, and drive revenue opportunities.  We focused heavily on the execution of our deliverables to achieve these goals.  **Today, our teams in the U.S. and China act as one**, and we are nearing the completion of our new nano lithium titanate and energy storage system plants on 106 acres that we acquired the land use rights for in Wu'an, China.

In addition, we have delivered multiple grid-scale systems to leading grid operators that have stated how impressed they are with our product's performance and that we can use as key references. We have reduced our operating expenses by 36% as compared to the quarter immediately preceding my start date back in April 2012, and we hit this target while ramping up our China team from just a few employees to a 78 person /team. With respect to revenue, we recognized $3.2 million in revenue this quarter, which brings our mid-year revenue total to $5.0 million. We currently have $5.5 million in deferred revenue, and we are on track to have one of our best years on record. As we noted last quarter, 2013 will truly be a milestone year for Altair.

August 8, 2013 Altair Press Release (emphasis added).

24.     On August 14, 2013, the Company filed a Form 10-Q, which stated the following

regarding the Company's internal controls and procedures:

**Controls and Procedures**

(a)     Based on their evaluation as of June 30, 2013, which is the end of the period covered by this Quarterly Report on Form 10-Q, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) of the Exchange Act) are effective, based upon an evaluation of those controls and procedures required by paragraph (b) of Rule 13a-15 or Rule 15d-15 of the Exchange.

(b)     There have been no changes in our internal control over financial reporting

identified in connection with the evaluation required by paragraph (d) of Exchange Act Rules 13a-15 or 15d-15 that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

25.    On October 25, 2013, the Company filed with the SEC its Definitive Proxy stating the following:

## Audit Committee and Audit Committee Report

### Audit Committee

The Audit Committee operates pursuant to a written charter adopted by the Board, a copy of which may be found on the Company's website under the heading "Investors". A copy may also be obtained free of charge by mailing a request in writing to: Secretary, Altair Nanotechnologies Inc., 3019 Enterprise Drive, Anderson, Indiana 46013, U.S.A.

From July 22, 2011 through November 28, 2012, the Audit Committee was comprised of Zhigang Zhao (Chair), Alexander Lee, and Hong Guo.  On November 28, 2012, Mr. Lee was removed from the Audit Committee and Victor Sze was appointed to the Audit Committee. On September 26, 2013, Mr. Sze and Ms. Guo resigned from the Audit Committee, and Yuhong Li and Eqbal Al Yousuf were appointed to the Audit Committee. With the exception of Mr. Lee, all persons serving on the Audit Committee during the period described above were determined by the Board to be independent under the requirements of the Nasdaq listing standards and governing law. Mr. Lee has served on the Audit Committee, despite his appointment as Interim Chief Executive Officer in April 2012, pursuant to a temporary exemptions in Nasdaq Marketplace Rule 5605(c)(4)(A), which permits a non-independent director to serve on the Audit Committee under special circumstances for a period expiring on the Company's next annual stockholders meeting and the one-year anniversary of Mr. Lee's appointment as interim Chief Executive Officer.

The Audit Committee held five meetings via conference call during the fiscal year ended December 31, 2012.  The members of the Audit Committee were in attendance at each meeting.

....

The Audit Committee's responsibility is to assist the Board in its oversight of (a) the quality and integrity of the Company's financial reports, (b) the independence and qualifications of the Company's independent auditor, and (c) the compliance by the Company with legal and regulatory requirements.  Management of the Company has the responsibility for the Company's financial statements as well as

the Company's financial reporting process, principles and internal controls. The Company's independent public accounting firm is responsible for performing an audit of the Company's financial statements and expressing an opinion as to the conformity of such financial statements with accounting principles generally accepted in the United States of America.

## Audit Committee Report

The Audit Committee reviewed and discussed the audited financial statements of the Company as of and for the year ended December 31, 2012 with management and with the independent public accounting firm. The Audit Committee has discussed with the independent public accounting firm the matters required to be discussed by Statement on Auditing Standards No. 61 (Communication with Audit Committees), as currently in effect. In addition, the Audit Committee has received the written disclosures and the letter from the independent public accounting firm required by applicable requirements of the Public Corporation Accounting Oversight Board regarding the independent auditor's communications with the Audit Committee concerning independence, and has discussed with the independent public accounting firm the independent auditor's independence.

The Audit Committee has also considered whether the independent auditor's provision of non-audit services to the Company is compatible with maintaining the auditors' independence.

The members of the Audit Committee are not engaged in the accounting or auditing profession and, consequently, are not experts in matters involving auditing or accounting including in respect of auditor independence. As such, it is not the duty of the Audit Committee to plan or conduct audits or to determine that the Company's financial statements fairly present the Company's financial position and results of operation and are in accordance with generally accepted accounting principles and applicable laws and regulations. Each member of the Audit Committee is entitled to rely on (i) the integrity of those persons within the Company and of the professionals and experts (such as the independent auditor) from which the Audit Committee receives information, (ii) the accuracy of the financial and other information provided to the Audit Committee by such persons, professionals or experts absent actual knowledge to the contrary and (iii) representations made by management or the independent public accounting firm as to any information technology services of the type described in Rule 2-01(c)(4)(ii) of Regulation S-X and other non audit services provided by the independent auditor to the Company.

Based on the reports and discussions described above, the Audit Committee recommended to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2012, for filing with the SEC.

AUDIT COMMITTEE

Zhigang Zhao, Chair
Victor Sze
Hong Guo

26.     The October 25, 2013 Definitive Proxy ("the October 25th Proxy") did not state the reason for the simultaneous September, 2013 resignations of Mr. Sze and Ms. Guo from their directorships including their membership on the Audit Committee, and Liming Zou from his directorship and position as President of the Company.  Nor did the October 25th Proxy indicate how Mr. Sze and Ms. Guo could have signed off on the Audit Committee Report therein (cited above) issued on October 25, 2013, given that Ms. Sze and Ms. Guo had resigned on September 26, 2013.  Nor did the October 25, 2013 Proxy disclose in the Audit Committee Report contained therein or otherwise, that the Company's subsidiaries in China were operating without proper auditing and financial controls.

27.     On November 13, 2013, the Company issued a press release, stating the following:

> We have taken drastic action to further reduce our costs including consolidating our Accounting and Finance Department into the Anderson location.  In addition, some of our key research and development staff is devoting a substantial amount of time in our facilities in China in order to speed up the production capabilities in our new facilities. As production ramps up in China, we will realize the cost efficiencies in production that was the primary motivator for moving operations to China. Currently, our team in China has grown to 181 employees with most of the additions to our operations team.

28.     The November 13, 2013 press release did not reveal that the operation of the Company's subsidiaries in China was not integrated with its accounting and control structure which was centered in the United States.

29.     On November 19, 2013, the Company filed a Form 10-Q, which stated the following regarding the Company's internal controls and procedures:

10

**Controls and Procedures**

(a)    Based on their evaluation as of September 30, 2013, which is the end of the period covered by this Quarterly Report on Form 10-Q, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) or 15d-15(e) of the Exchange Act) are effective, based upon an evaluation of those controls and procedures required by paragraph (b) of Rule 13a-15 or Rule 15d-15 of the Exchange.

(b)    There have been no changes in our internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of Exchange Act Rules 13a-15 or 15d-15 that occurred during our last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

30.    The above statements made by the Company were false and/or misleading because they failed to disclose facts that were detrimental to the Company's business, operational and compliance policies, and internal controls over financial reporting, which the Defendants, intentionally, recklessly, and/or negligently disregarded.  Specifically, Defendants failed to disclose that: (1) the Company's 2012 expansion into China was experiencing serious problems due to the Company's failure to integrate its existing controls and management based in America and its new operations in China; the Company did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; (2) the Company's management was experiencing significant turnover due to executive's resignations, which in turn led to a lack of internal controls to perform a timely review of transactions at an appropriate level of precision; (3) Due to the mismanagement and disorganization, the Company did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements; (4) the Company did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, failed to detect material misstatements that were identified by its auditor during its audit process; and, (5)

the Company failed to implement adequate procedures and controls to ensure the completeness and accuracy of its financial statements and related subsequent events.

## THE TRUTH EMERGES

31.    On January 13, 2014, the Company filed a Form 8-K with the SEC disclosing that the Board of Directors accepted the resignation of Paula Conroy. She was the Company's CFO and held positions of employment with the Company's subsidiaries.

32.    On January 23, 2014, the Company filed a Form 8-K with the SEC disclosing the following pertaining to the Company's Chinese operations:

> On January 19, 2014, Altairnano, Inc. approved plans to consolidate all US manufacturing operations and transition manufacturing to Wu'an, China starting in the second quarter of 2014. We will retain engineering, research and development, sales and marketing, and support capabilities in the US. We are currently in the final planning phases of this initiative and the Company will roll out details to our customers in the near future.

33.    On February 20, 2014, the Company filed a Form 8-K, which stated the following:

> On February 16, 2014, the Board of Directors of Altair Nanotechnologies Inc. received a letter of resignation effective February 21, 2014 from Richard W. Lee as Chief Executive Officer and Director of the Company and from positions with its subsidiaries.

34.    On March 24, 2014 the Company filed a Form 8-K, which stated, in pertinent parts, the following:

> At a meeting of the Board of Directors of Altair Nanotechnologies Inc. on March 18, 2014, the Board of Directors appointed Guohua Sun as Interim Chief Executive Officer and appointed Karen Werner as Interim Chief Financial Officer.

35.    On March 26, 2014 the Company filed a Form 8-K, which stated:

> Effective March 20, 2014, Eqbal Al Yousuf resigned from the Board of Directors (the "Board") of Altair Nanotechnologies Inc. (the "Company"). Mr. Al Yousuf was a member of the Audit Committee of the Board at the time of his resignation.

In a resignation letter, Mr. Al Yousuf indicated he was resigning due to his disagreement with certain of the Company's operations, policies or practices.

36.    Mr. Al Yousuf's letter of resignation, in pertinent parts, stated:

Altair Nanotechnologies Inc. is at a very critical stage in its history and its very existence is at risk. During a period like this one, it is absolutely critical that we work together to solve our problems but we have failed to do so. In recent months, our board has ceased to function effectively and I have lost confidence in our Chairman's ability to oversee this board in the best interests of the company and its stakeholders (including our employees, shareholders, customers and certainly more so than ever, our creditors). I am also concerned that a subset of the board has been speaking on behalf of the full board, that the rest of the board has not been properly informed and has not been given an opportunity to express its views, nor is even included in deliberations about material developments affecting the Altair US group at large. Directors need to hear from one another in an open forum so all issues can be aired in a transparent fashion. Directors must put personal relationships and issues aside that might color their decision-making process. The board must be led by a Chairman who is unbiased, and focused only on what is best for the corporation. A properly functioning board needs to be fully informed about all material facts about a corporation in order to make deliberate and intelligent decisions. Extreme candor among directors is critical. This board has failed to achieve this goal.

My repeated efforts to rectify this perilous course have been unheeded. Accordingly, I have no choice but to tender my resignation from the board of Altair US, effective immediately. Admittedly, it is for me an extraordinary step to tender my resignation, but you should understand that I am doing so as a last resort opportunity to voice my concerns over the direction of Altair US.

I am concerned that since the resignation of Richard Lee was announced to the market earlier this year, on February 16, the office of chief executive officer has been left vacant and no apparent efforts (at least any efforts that I have been associated with) to find a viable replacement have been undertaken since then. Paula Conroy, our former Chief Financial Officer, also resigned earlier this year and the circumstances of her departure are still unclear to me. It appears to me that a lot of other qualified people have been terminated or have left the company. I learned early this morning that the board had decided to appoint Guohua Sun and Karen Werner as Interim Chief Executive Officer and Interim Chief Financial Officer, respectively. I understand that this decision was taken at an emergency board meeting which took place yesterday. Even though I was invited to participate in the meeting - which took place via teleconference - , I was not able to join the debates as the meeting codes provided to me did not appear to be working (it is not the first time that this happens to me). Also, I was not provided with any background information regarding Mr. Sun and Ms. Werner and I am not aware of whether the board fully considered such candidates based on their

merits and past experience in our industry. I also learned that Mr. Sun is an employee of our main shareholder and I therefore hope that the appointment process was not tainted by personal relationships. As for many other important issues affecting the future of our company, I sincerely wish that the process would have been more open, transparent and based on a fully considered process taking the company's best interests into consideration. Did the board interview several candidates for such jobs, taking into account their respective merits and suitability for the positions? I suspect in light of the suddenness of the appointments and the fact that the board meeting deciding on their appointments did not last more than 12 minutes, that it was not the case. I would therefore request that Mr. Sun's and Mrs. Werner's tenures be reevaluated. We have been flying totally blind for too long, I am afraid. New officers, qualified for the job and effectively empowered by the board, need to be appointed as soon as possible. A search for the most suitable candidates for such jobs needs to be undertaken without further delays. I am concerned that material information regarding our Chinese operations is not properly shared with the board and that important decisions affecting the Altair US group as a whole are taken at the level of our Chinese affiliates, without consultation of this board. A recent example of this are the loans granted by the Bank of China and the Wu'an Rural Credit Cooperative Co, Limited in October, last year for amounts of approximately $3.8MM and US $17MM, respectively. These are material developments but I only learned about them when stumbling upon the press release filed by the company. This was not discussed during any of our board deliberations. Corporate governance principles need to extend throughout the Altair US group but unfortunately they do not. Our Chinese operations are a total "black box" for certain members of this board, including me.

The implementation of the relocation of our manufacturing facilities to Wu'an in China is far exceeding the plans that were originally presented to the board. Employees at our Anderson facility are worried about their future and are resigning in droves. We cannot afford to let our intellectual capital walk out of the door - this board should communicate to the employees to inform them with specificity about their future within the group. Our US customers are reluctant to order from us. They need to be reassured about the continuity of our supply chain. I understand that one of the Company's largest customers in the US recently voiced his concerns about our ability to deliver on a large order. We need to take a very hard look at the image we are projecting. I am also very concerned about the budgeting process in respect of the relocation of our manufacturing to China. The costs associated with such relocation have not been fully disclosed to the board and appear to be creeping up.

37.     On April 1, 2014, the Company filed a Form NT 10-K, which stated that the

Company was not able to meet the March 31, 2014 deadline for the filing of its Form 10-K for

the period ended December 31, 2013. The Company was unable to file the Report within the

prescribed time period "due to delays in completing the required consolidation under U.S. GAAP."

38.     On April 23, 2014, the Company filed a Form 8-K with the SEC.  The letter from the Nasdaq Stock Market indicated that the Company was not in compliance with the audit committee requirements in Nasdaq Marketplace Rule 5605.   Rule 5605 requires that the Company have an audit committee composed of at least three independent directors.  The letter goes on to state that other than directors who are already serving on the audit committee, none of the Company's existing directors satisfy the independence requirements associated with the audit committee.  The letter stated:

> On April 16, 2014, Altair Nanotechnologies Inc. (the "Company") received a letter from The Nasdaq Stock Market ("Nasdaq") indicating that the Company was not in compliance with the audit committee requirements in Nasdaq Marketplace Rule 5605. Among other things, Rule 5605 requires that the Company have an audit committee composed of at least three independent directors. Eqbal Al Yousuf, a member of the Company's audit committee, was appointed to the Board of Directors and the Audit Committee on August 26, 2013 and resigned on March 20, 2014. According to the letter, pursuant to Rule 5605(c)(4), the Company has been provided a cure period in order to regain compliance, which cure period shall survive until the earlier of the Company's next annual shareholders meeting or March 20, 2015.

> Other than directors who are already serving on the audit committee, none of the Company's existing directors satisfy the independence requirements associated with the audit committee. The Company is reviewing potential director candidates that it believes would be qualified to serve on the audit committee and expects to regain compliance as soon as practical, but in no event later than the deadline.

> On April 16, 2014, the Company received a second letter from Nasdaq indicating that the Company was not in compliance with the continuous listing rules due to its failure to file its Annual Report on Form 10-K for the year ended December 31, 2013 (the "Annual Report") on a timely basis. Under the rules, the Company has 60 days to submit a plan to regain compliance and if the plan is accepted, the Company could be granted up to 180 calendar days from the Annual Report's due date, or until October 13, 2014, to regain compliance. The Company will also be added to Nasdaq's list of non-compliant companies.

39.     On August 19, 2014, the Company filed a Form 8-K with the SEC, which announced that Altair received another letter from NASDAQ that stated that the Company was not in compliance with the continuous listing rule of 5250(c)(1) due to the Company's failure to timely file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2014.  The Form 8-K stated in relevant parts:

> On August 18, 2014, Altair Nanotechnologies, Inc. (the "Company") received a letter from the Nasdaq Stock Market ("Nasdaq") indicating that the Company was not in compliance with continuous listing rule 5250(c)(1) due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2014. Nasdaq staff had previously granted the Company until July 31, 2014 to file its Annual Report on Form 10-K for the year ended December 31, 2013 (the "Form 10-K") and until September 30, 2014 to file its Quarterly Report on Form 10-Q for the period ended March 31, 2014. The Company failed to file the Form 10-K within the extension period, and Nasdaq staff is evaluating an explanation and new timeline submitted by the Company.

40.     The August 19, 2014 Form 8-K also stated that the Company received a letter of resignation from Guo-Hua Sun as the Interim Chief Executive Officer of the Company.  The pertinent part stated as follows:

> On August 13, 2014, the Company received a letter of resignation from Guo-Hua Sun as the Interim Chief Executive Officer of the Company due to time constraints and the identification of a suitable replacement candidate. Mr. Sun will continue to serve as a director of the Company and as an executive of Zhuhai Yintong Energy Company Ltd. and other entities under common control with the Company's majority shareholder, Energy Storage (China), Ltd.

41.     On September 4, 2014 the Company filed a Form 8-K with the SEC, which stated that Crowe, the independent registered public accounting firm of Altair, resigned as the Company's independent registered public accounting firm because it was unable to complete the audit of the Company's financial statements for the year ended 2013.  Crowe also stated that it was resigning due to the Company's material weakness relative to implementing controls and procedures to ensure accurate and timely communications between the Company's subsidiaries

in China and its U.S.-based accounting team. The pertinent part of the Form 8-K stated as follows:

> On August 28, 2014, Crowe Horwath LLP ("Crowe"), the independent registered public accounting firm of Altair Nanotechnologies (the "Company"), resigned as the Company's independent registered public accounting firm.
>
> In 2013, the Company determined to significantly expand its operations in China and, as a result, by the end of 2013, the Company had become an entity operating primarily in China. In its resignation letter, Crowe advised the Company that it was resigning due to its inability to complete the audit of the Company's financial statements for the year ended 2013 in part due its inability to perform sufficient procedures to determine the completeness of reporting of subsequent events transactions that may have occurred in China and in part due to the Company's material weakness relative to implementing controls and procedures to ensure accurate and timely communications between the Company's subsidiaries in China and its U.S.-based accounting team.

42.     According to the September 4, 2014 Form 8-K, the letter to management and the Audit Committee of the Company's Board of Directors identified the following material weaknesses.

- Altair experienced significant executive management and accounting level turnover in 2013, which led to a lack of segregation of duties throughout the company, and resulted in a lack of controls to perform a timely review of transactions at an appropriate level of precision;

- Altair did not implement adequate procedures and controls over the 2013 year-end financial close and reporting process to ensure timely filings in compliance with its financial reporting requirements;

- Altair did not implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions, and as a result, did not detect the material misstatements that were identified by Defendant Crowe during its audit process;

- Altair did not implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China, and as a result, led to material misstatements that were identified by Defendant Crowe during its audit process;

- Altair did not implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.

43.     As a result of this disclosed information, NASDAQ discontinued trading in Altair's shares during the trading day on September 4, 2014 at a price of $4.30 per share.

44.     On September 24, 2014, the day that Altair resumed trading, the stock price plummeted to close at $0.95.

45.     This was a decline of $3.35 per share from the halted share price of $4.30.

46.     The Director Defendants breached their fiduciary duties by failing: (i) to perform a timely review of transactions at an appropriate level of precision; (ii) to implement adequate procedures and controls to ensure timely filings in compliance with its financial reporting requirements; (iii) to implement adequate procedures and controls to appropriately evaluate routine and non-routine transactions; (iv) to implement adequate procedures and controls to ensure accurate and timely communication with its subsidiaries in China; and (v) to implement adequate procedures and controls to ensure the completeness and accuracy of its consolidated financial statements and related subsequent events.  As a result, the Director Defendants failed to detect the material misstatements made on behalf of the Company to its shareholders and the investing public identified by Crowe during its audit process.

## DAMAGES TO THE COMPANY

47.     Altair has been, and will continue to be, severely damaged and injured by the Director Defendants' misconduct.  As a direct and proximate result of the Director Defendants' conduct, Altair has been seriously harmed and will continue to be.

48.     Harm that resulted from these disclosures includes, but is not limited to:

  a.   Costs incurred in compensation and benefits paid to defendants that breached

their duties to the Company;

b.   substantial loss of market capital;

c.   costs already incurred defending against the pending securities class actions, and potential liability therefrom; and

d.   Altair's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.

49.   The actions complained of herein have irreparably damaged Altair's corporate image and goodwill. For at least the foreseeable future, Altair will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Altair's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DEFENDANTS' DUTIES

50.   By reason of their positions as directors, and/or as a majority shareholder of Altair, Defendants were fiduciaries of Altair and because of their ability to control the business and corporate affairs of Altair, and owed Altair and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Altair in a fair, just, honest, and equitable manner.

51.   The Director Defendants were and are required to act in furtherance of the best interests of Altair and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Altair and its shareholders the fiduciary duty to exercise good faith and loyalty and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

52.     The Director Defendants, because of their positions of control and authority as directors and/or officers of Altair, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Altair, each of the Director Defendants had knowledge of material non-public information regarding the Company.

53.     To discharge their duties, the officers and directors of Altair were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Altair were required to, among other things:

        a.   Exercise good faith and loyalty to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

        b.   Exercise good faith and loyalty to ensure that the Company was operated in a prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

        c.   Exercise good faith and loyalty to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

        d.   When put on notice of problems with the Company's business practices and operations, exercise good faith and loyalty in taking appropriate action to correct the misconduct and prevent its recurrence.

54.     As the majority shareholder with the power to select the Board of Directors, Defendant Canon had a fiduciary duty to ensure that it selected a Board that was capable of and did perform its basic fiduciary duty of overseeing the Company particularly in the area of financial controls.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

55.     A pre-suit demand of the Altair Board was futile, and therefore, excused because a majority of the Board of Directors-Defendants are not independent.

56.     The present Board of directors consists of the following six persons: (1) James T. Zhan (appointed 9/12/14); (2) Guohua Sun (appointed on 7/22/11); (3) Yincang Wei (appointed 7/22/11); (4) Jun Liu (appointed 7/22/11); (5) Dr. Ching Chuen Chan (first elected 11/28/12); and, (6) Guohua Wei (appointed 9/26/13).

### A Majority of the Board of Directors Are or Have Recently Been, Full Time Employees of Altair and/or its Wholly Owned Subsidiaries

57.     Three of the Company's six directors are or have recently been, full time employees of the Company.

58.     Defendant Zhan is and has been the CEO of Altair since August 15, 2014 at a salary of $300,000 per year and has been a director since his appointment on September 12, 2014. Form 8-K, filed on September 16, 2014. Defendant Zhan derives significant income from, and his primary source of income is, his employment as the Company's CEO and his professional reputation is inextricably bound to his role at Altair; as such Defendant Zhan is incapable of acting independently and demand would be futile upon him.

59.     Defendant Sun is and has been a director since he was first appointed on July 22, 2011.  Defendant Sun served as interim CEO for the Company from March 18, 2014 until

Case 1:14-cv-09418-AT-HBP   Document 1   Filed 11/26/14   Page 22 of 32

August 13, 2014. Particularly given that a significant portion of the wrongdoing alleged herein occurred on Defendant Sun's 'watch' as CEO, his professional reputation is inextricably bound to his role as CEO at Altair during this period; as such Defendant Sun is incapable of acting independently and demand would be futile upon him.

60.     Defendant Guohua Wei's principal employment is "Legal Representative and Executive Director of the Company's (Altair's) indirect subsidiaries in China." Altair SEC Form 14A Proxy Statement, issued October 25, 2013. Defendant G. Wei derives significant income from, and his primary source of income is, his employment by the Company and/or its wholly owned and controlled subsidiaries; as such Defendant G. Wei's professional reputation is inextricably bound to his role at Altair and Defendant G. Wei is incapable of acting independently and demand would be futile upon him.

### A Majority of the Board of Directors Are Controlled by and Were Appointed to the Board of Directors by the Company's Majority Shareholder

61.     Four of the six directors on the Altair Board of Directors were appointed, not elected, to their directorships by the majority shareholder of Altair and are therefore not independent (and the two remaining directors were appointed by directors appointed by the majority shareholder). Under the terms of an agreement between Altair and Defendant Canon Investment Holdings Limited ("Canon"), who owns 6,172,801, or 53.26% of shares of Altair, the Altair Board of Directors is required to appoint "a number of directors nominated by Canon representing a majority of the Board." Altair SEC Form 14A Proxy Statement, issued October 25, 2013. As of the date of the filing of the present Complaint, according to the last proxy filed by Altair (the October 25, 2013 Form 14A Proxy Statement), other SEC filings by the Company and the Company website, four of the six members of the present Board of Directors were

appointed by the Board at the instruction of Canon:

> Mr. Sun was appointed to the Board pursuant to a covenant in an agreement between the Company and Canon. Pursuant to the covenant, the Board of the Company is required, except where legal or fiduciary duties would require otherwise, to appoint a number of directors nominated by Canon representing a majority of the Board.

*     *     *

> Mr. (Yincang) Wei was appointed to the Board pursuant to a covenant in an agreement between the Company and Canon Investment holdings Limited ("Canon"). Pursuant to the covenant, the Board of the Company is required, except where legal or fiduciary duties would require otherwise, to appoint a number of directors nominated by Canon representing a majority of the Board.

*     *     *

> Mr. Liu was appointed to the Board pursuant to a covenant in an agreement between the Company and Canon. Pursuant to the covenant, the Board of the Company is required, except where legal or fiduciary duties would require otherwise, to appoint a number of directors nominated by Canon representing a majority of the Board.

*     *     *

> Mr. (Guohua) Wei was appointed to the Board pursuant to a covenant in an agreement between the Company and Canon. Pursuant to the covenant, the Board of the Company is required, except where legal or fiduciary duties would require otherwise, to appoint a number of directors nominated by Canon representing a majority of the Board.

> Altair SEC Form 14A Proxy Statement, issued October 25, 2013.

62.     Three of the four Canon appointees to Altair directorships either presently are or recently were Canon employees.  According to the October 25, 2013 Proxy, Defendant Sun's "principal occupation" is "General Manager, Canon Investment Holdings Limited," and Defendant Yincang Wei's "principal occupation" is "Chairman, Canon Investment Holdings

Limited." Defendant G. Wei "served as head of administrative department of Canon Investment

Holdings Co., Ltd from 2007-2013." Defendant G. Wei is the nephew of Yingcang Wei.

63.      Defendant Yincang Wei is the Executive Director and sole stockholder of Canon.

By and through defendant Wei's sole ownership in Canon, he owns 6,172,801 shares of Altair

stock, or 53.26%. As a majority shareholder, defendant Wei has a significant financial stake in

the performance of Altair, and is incapable of acting independently. As such, demand would be

futile upon him.

64.      Altair has recognized the obvious fact that it does not have an independent Board

of Directors. On April 23, 2014, Altair filed a SEC Form 8-K in which the Company announced

that it had been notified by The Nasdaq Stock Market that the Company was not in compliance

with the audit committee requirements in Nasdaq Marketplace Rule 5605 because the Company

lacked an audit committee composed of at least three independent directors. According to the

Company's statement in the April 23, 2014 SEC Form 8-K,

> Other than directors who are already serving on the audit
> committee, none of the Company's existing directors satisfy the
> independence requirements associated with the audit
> committee. The Company is reviewing potential director candidates that it
> believes would be qualified to serve on the audit committee and
> expects to regain compliance as soon as practical, but in no event
> later than the (March, 2015) deadline.

65.      Since Canon owns a controlling share of Altair, and directly controls a majority of

the Board of Directors, a majority of the Board of Directors is incapable of acting independent,

but are acting on the behalf of Canon.

**A Majority of the Board of Directors Face a Sufficiently
Significant Likelihood of Liability so as to be Rendered Non-
Impartial**

66.      The liability producing wrongdoing that is the foundation of the present action

consists of a wholesale abandonment of oversight of a company. Altair operated with no functioning audit committee or financial controls and admitted so much in the April 23, 2014 SEC Form 8-K. The Director-Defendants gave up on even pretending to have functioning controls after their auditor resigned due to irregularities – Altair simply stopped filing required financial reports. Other than Defendant Zhan, the Director-Defendants were all on the Board of Directors during the precise years of the above described knowing gross derogation of duty. This was ultimately a failure of the Board of Director to perform its primary oversight functions. Therefore, all of the Director-Defendants face a sufficiently substantial likelihood of liability in the present claim as to render them non-impartial to consider demand.

## COUNT I
### Against the Director Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder

67.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

68.     Rule 14a-9, promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. Specifically, the Company's proxy statement filed on October 25, 2013 ("the Proxy"), violated Section 14(a) and Rule 14a-9 because it included materially false and misleading statements and material omissions that made other statements in the proxy statement materially false or misleading. The Proxy did not disclose: (1) discussions the Audit Committee held with Crowe and the reason for the simultaneous September, 2013 resignations of Mr. Sze and Ms. Guo from their directorships

including their membership on the Audit Committee, and Liming Zou from his directorship and position as President of the Company; and (2) other executive and management level resignations and the reasons therefore and the Company's ability to perform timely reviews of transactions in its China operations. Further, the Proxy did not indicate how Mr. Sze and Ms. Guo could have signed off on the Audit Committee Report therein (cited above) issued on October 25, 2013, given that Mr. Sze and Ms. Guo had resigned on September 26, 2013. Nor did the October 25, 2013 Proxy disclose in the Audit Committee Report contained therein or otherwise, that the Company's subsidiaries in China were operating without proper auditing and financial controls. These material omissions made the other statements in the proxy statement materially false or misleading and contributed to the ongoing misrepresentation of the actual condition and value of the Company and resultant inflation of the value of the Company's share values.

69.     The Company's ongoing concealment of its deep problems with lack of financial controls over its subsidiaries in China, of which the October 25, 2013 Proxy was a material component, eventually came to light resulting in a dramatic drop in value of the Company's shares. Prior to its resignation, Crowe had sent a letter to the Company's management and Audit Committee of the Company's Board of Directors stating the weaknesses internal controls. This disclosure led to NASDAQ halting Altair's shares during the trading day on September 4, 2014, at $4.30 per share. When Altair's shares resumed trading, on September 24, 2014, 20 days after it was initially taken off the market, the Company's shares fell $3.35 per share, and closed at $0.95. This represented a nearly 90% drop in value, from a closing of $7.99 on October 14, 2013, to a closing price of $0.95 on September 24, 2014, due to the failure of the Director Defendants to report the weaknesses and take corrective action in the Company's controls.

70.     In the exercise of reasonable care, the Director Defendants should have known that the statements contained in the proxy were materially false and misleading by artificially inflating the value of the Company's stock throughout the Relevant Time Period.

71.     The misrepresentations and significant omissions in the proxy statement were material to the Company's shareholders in evaluating the true condition of the Company, leading investors to believe that the artificially high stock prices were correct.  The proxy statement was an essential link in the accomplishment of the continuation of Director Defendants' continued violation of their fiduciary duties in connection with the improper oversight and control of the company and the failure to institute sufficient controls.

72.     The Director Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     By virtue of the foregoing, Director Defendants have violated Section 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder.

74.     As a direct and proximate result of Director Defendants' wrongful conduct, the Company and the investing public suffered damages in connection with their respective purchases and sales of the Company's common stock during the Relevant Time Period.

## COUNT II
### Breach of Fiduciary Duty and Duty of Loyalty

75.     Plaintiff incorporates by reference and alleges each and every allegation set forth above, as though fully set forth herein.

76.     Each defendant owes and owned to the Company the duty to exercise candor good faith, and loyalty in the management and administration of Altair's business and affairs, particularly with respect to issues so fundamental as compliance with laws and regulation and

regulatory body and shareholder reporting.

77.     Defendants' conduct set forth herein was due to their knowing breach of the fiduciary duties and the duty of loyalty they owed to the Company. Defendants were aware that they were taking payments that were unearned and improper and intentionally misreported the value of those payments to conceal them from shareholders.

78.     Defendants' conduct set forth herein was due to their knowing breach of the fiduciary duties and the duty of loyalty they owed to the Company. Defendants were aware of and participated in Altair's failure to disclose material information and making or false and misleading statements to the SEC, investors, and the general public. In this fashion Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Altair.

**COUNT III**
**Abuse of Control**

79.     Plaintiff incorporates by reference and alleges each and every allegation set forth above, as though fully set forth herein.

80.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Altair, for which they are legally responsible.

81.     As a direct and proximate result of defendants' abuse of control, Altair has sustained significant damages. In particular, Defendants abused their positions of authority by causing or allowing Altair to misrepresent material facts regarding its financial position and business prospects.

82.     As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Altair has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the

28

Company.

83.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, Altair has sustained damages.

## COUNT IV
## Unjust Enrichment

84.     Plaintiff incorporates by reference and alleges each and every allegation set forth above, as though fully set forth herein.

85.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Altair

86.     Plaintiff, as a shareholder and representative of Altair, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Altair and that plaintiff is a adequate representative of the Company;

B.     Declaring that the Director Defendants have knowingly breached their breach of their fiduciary duties to Altair;

C.     Determining and awarding to Altair the damages sustained by it as a result of the violations set forth above from each of the Director Defendants jointly and severally, together with interest thereon;

D.     Directing Altair and the Director Defendants to take all necessary actions to

reform and improve its corporate governance and internal procedures, including, but not limited to the appointment of an independent panel of three outside directors to investigate and report upon the above described payments and to issue a report thereon with recommendations for revised compensation procedures and standards to prevent such payments in the future;

E.      Rescinding any and all contractual agreements under which majority shareholder Canon was given the right to select directors for the Company's Board of Directors, and require the Board of Directors to appoint to the Board those directors selected by Canon.

F.      Directing Altair to select its Board of Directors by shareholder vote and establishing equitable voting rules so as to prevent the majority shareholder from controlling the vote.

G.      Determining and awarding to Altair exemplary damages in an amount necessary to punish the defendants and to make an example of Director Defendants to the community according to proof at trial;

H.      Awarding Altair restitution from each of the Director Defendants;

I.       Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

J.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 26, 2014

Respectfully submitted,

**LIFSHITZ & MILLER**

By: _Edward Miller_

Edward W. Miller (EM8489)
Joshua M. Lifshitz
821 Franklin Avenue, Suite 209
Garden City, NY 11530
(516) 493-9780
Fax: (516) 280-7376

*Attorneys for Plaintiff*

## VERIFICATION

I, Francesco Cavaliere, hereby declare as follows:

I am a shareholder of Altair Nanotechnologies, Inc. and have continuously so owned Altair Nanotechnologies, Inc. common stock during the relevant period. I have reviewed the foregoing Verified Shareholder Derivative Complaint ("Complaint"), and authorize its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information or belief.

I declare under penalty of perjury pursuant to the laws of this jurisdiction that the foregoing is true and correct.

October 26, 2014

_____
FRANCESCO CAVALIERE