UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/4/17
```

In re Altair Nanotechnologies Shareholder
Derivative Litigation

14 Civ. 9418 (AT)

**ORDER APPROVING CLASS
ACTION SETTLEMENT**

ANALISA TORRES, District Judge:

      Plaintiffs, Francesco Cavaliere and Ted Rauenbuehler, bring this consolidated shareholder derivative class action against a group of Individual Defendants,[1] Canon Investment Holdings, Inc. ("Canon"), and the nominal defendant Altair Nanotechnologies, Inc. ("Altair"), alleging fraud in connection with a proxy statement, breach of fiduciary duty, breach of the duty of loyalty, abuse of control, and unjust enrichment. On June 6, 2017, Plaintiffs moved pursuant to Federal Rule of Civil Procedure 23.1 for final approval of the proposed class action settlement and also moved for approval of attorneys' fees, expenses, and incentive awards. ECF No. 33. Al Yousuf L.L.C. ("Objector"), which owns 810,000 shares of Altair stock, objected to the settlement. Obj. Mem., ECF No. 40. The Court held a final fairness hearing on September 5, 2017. ECF No. 52. For the reasons stated below, Plaintiffs' motion for an order approving the class action settlement and granting attorneys' fees, expenses, and incentive awards is GRANTED.

---

[1] The Individual Defendants are Ezbal Al Yousuf, Ching Chuen Chan, Paula Conroy, Stephen Huang, Alexander Lee, Richard Lee, Jun Liu, Guohua Sun, Guohua Wei, Yingcang Wei, Karen Werner, Li Yang, James T. Zahn, Zhigang Zhao, and Liming (Albert) Zou.

## BACKGROUND

On November 26, 2014, Plaintiff Francesco Cavaliere filed a derivative complaint (the "complaint") on behalf of Altair against Altair, Altair's Board of Directors, and its majority shareholder, Canon.[2]  ECF No. 1.  The complaint alleges wrongdoing in connection with Altair's wholly-owned, China-based subsidiaries: Altair Nanotechnology Co., Ltd. and Northern Altair Nanotechnologies Co., Ltd.  Compl. ¶ 1.  These subsidiaries were established in 2012, and the complaint alleges that "Altair failed to implement adequate procedures and controls regarding its communication with its foreign operations in China." *Id.*

The complaint further alleges that Altair "lost control over financial information leading to an ongoing systemic failure to record and report and perform timely reviews of transactions with a reasonable level of precision." *Id.* ¶ 2.  Plaintiffs allege that on October 25, 2013, Altair filed a proxy statement with the Securities and Exchange Commission (the "SEC") that failed to "disclose . . . that the Company's subsidiaries in China were operating without proper auditing and financial controls," *id.* ¶ 25, and that on September 4, 2014, Altair announced that its public accounting firm had resigned due to its inability to conduct an audit because Altair failed to provide the auditor with sufficient financial information from the company's operations in China, *id.* ¶ 41.  According to the complaint, the reason for Altair's inability to control or audit its China operations was due to its majority shareholder, Canon: "Since Canon owns a controlling share of Altair, and directly controls a majority of the Board of Directors, a majority of the Board of Directors is incapable of acting independent[ly], but are acting on the behalf of Canon." *Id.* ¶ 65.  After Altair's auditor announced its resignation, Plaintiffs allege that "Altair

---

[2] On May 15, 2015, the Court consolidated Cavaliere's case with a similar derivative action, No. 14 Civ. 9958, brought by Ted Rauenbuehler, and appointed Faruqi & Faruqi, LLP and Lifshitz & Miller as co-lead counsel.  ECF No. 13.

shares dropped nearly 90% in value, from a closing of $7.99 on October 14, 2013 to a closing price of $0.95 on September 24, 2014." *Id.* ¶ 69.

The parties reached a settlement agreement in principle on July 12, 2016, "based on the implementation of certain corporate governance reforms." ECF No. 17. On July 27, 2016, Plaintiffs submitted a proposed settlement for preliminary approval, ECF No. 18, which the Court approved on August 22, 2016, ECF No. 23. However, on November 21, 2016, the parties wrote to inform the Court that the SEC had "revok[ed] the registration of [Altair's] securities," ECF No. 24, which required the parties to revise their settlement agreement, ECF Nos. 26-27. On January 20, 2017, Plaintiffs filed their revised settlement agreement, again seeking preliminary approval. ECF No. 28. By order dated March 7, 2017, the Honorable Thomas P. Griesa preliminarily approved the revised settlement. ECF No. 32. Judge Griesa's order required "publication of [Plaintiffs' proposed full notice] by posting it and making it accessible on Altair's corporate website," and "publication of the Summary Notice once in the national edition of the Investor's Business Daily and once on GlobeNewswire." *Id.* ¶ 6.

Plaintiffs filed their motion for final approval of the settlement, and for attorneys' fees, expenses, and incentive awards on June 6, 2017. ECF No. 33. The parties have agreed on a non-monetary settlement, which requires that Altair implement corporate governance reforms. The reforms include: "mandatory attendance of directors at annual shareholder meetings" and improving requirements related to Altair's "director education," "committee chairs," "audit committee," "internal controls and compliance functions," and "whistleblower program." Pls. Mem. 1-2, 6-8, ECF No. 34; Am. Corp. Reforms, ECF No. 30-2. The reforms must be maintained for five years or until there are fewer than 500 beneficial owners of Altair stock, Guber Decl. ¶ 26, ECF No. 35; Am. Stipulation of Settlement at 3, ECF No. 30-1, and according

to the parties, such reforms "directly address the deficiencies in financial controls and oversight which Plaintiffs contend damaged Altair." Pls. Mem. 1.

Co-lead counsel, Faruqi & Faruqi, LLP and Lifshitz & Miller, request $150,000 for 371.70 hours of work and to reimburse their expenses. Lifshitz Decl. ¶¶ 6, 9, ECF No. 36; Guber Decl. ¶¶ 57, 74-83; Stipulation of Settlement at 16, ECF No. 20-1 ("[Altair] will pay attorneys' fees and expenses . . . not to exceed $150,000."). Counsel represents that the lodestar is $234,953.75 ($632.11 per hour), Guber Decl. ¶ 82, which results in a "negative" lodestar multiplier of 0.64. The two named Plaintiffs seek incentive awards of $1,500 each. Guber Decl. ¶ 2; Pls. Mem. 21-22.

## DISCUSSION

I.  Legal Standard

Federal Rule of Civil Procedure 23.1 provides that a "derivative action may be settled . . . only with the court's approval." Fed. R. Civ. P 23.1(c). "The central question . . . is whether the compromise is fair, reasonable and adequate." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982). "[I]n the context of a derivative action settled on behalf of the class of all shareholders, this requires consideration, in particular, of whether the settlement is the result of arm's-length negotiations in which plaintiffs' counsel has effectively represented the interest of the shareholder class, and whether the substantive terms of the settlement are in the interests of [the company] and its shareholders relative to the likely rewards of litigation." *In re Fab Universal Corp. S'holder Derivative Litig.*, 148 F. Supp. 3d 277, 280 (S.D.N.Y. 2015) (quoting *In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336, 340 (S.D.N.Y. 2011)). There is a "strong judicial policy in favor of settlements, particularly in the class action context." *Wal-*

*Mart Stores, Inc. v. Visa USA, Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)).

The settlement must be fair "with respect to both 'the negotiating process leading up to settlement as well as the settlement's substantive terms.'" *In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302, 2006 WL 2572114, at *2 (S.D.N.Y. Sept. 6, 2006) (*AOL I*) (quoting *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)).  With this directive in mind, the Court proceeds to evaluate the procedural and substantive fairness of the settlement.

II.     Procedural Fairness

The Court is first tasked with ensuring the fairness of the "negotiating process by which the settlement was reached." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 473 (S.D.N.Y. 1998). "So long as the integrity of the arm's length negotiation process is preserved, however, a strong initial presumption of fairness attaches to the proposed settlement." *Id.* at 474. The Court may presume that a settlement negotiated at arm's-length by experienced counsel is fair and reasonable. *See In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("A proposed class action settlement enjoys a strong presumption that it is fair, reasonable and adequate if, as is the case here, it was the product of arm's-length negotiations conducted by capable counsel, well-experienced in class action litigation arising under the federal securities laws." (quoting *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177 (S.D.N.Y. July 27, 2007))).

Here, there is no dispute that there were experienced counsel on both sides. Plaintiffs' counsel, Lifshitz & Miller and Faruqi & Faruqi, have substantial experience litigating shareholder derivative actions, and Defendants' are represented by a well-regarded law firm,

5

Katten Muchin Rosenman, LLP.  *See* Lifshitz Decl. ¶ 4; Lifshitz & Miller Firm Resume, ECF No. 36-1; Guber Decl. ¶ 38; Faruqi & Faruqi Firm Resume, ECF 35-1

From the Court's vantage point, there is no reason to doubt counsel's characterization of the settlement discussions as "hard fought" and at "arms-length," Guber Decl. ¶ 8, or "very difficult" and made in "good faith," Fairness Hr'g Tr. 10:14, ECF No. 54; Defs. Ltr. 1, ECF No. 58.  Although the Court recognizes that incentives in the shareholder class action context may produce a "temptation of class counsel to sacrifice procuring value for the class in exchange for maximizing attorney's fees," *Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 119 (S.D.N.Y. 1999), such concerns appear minimal here.  Counsel engaged in two rounds of negotiations, having to re-negotiate the agreement following the revocation of Altair's securities registration.  *See* Fairness Hr'g Tr. 7:1-8; Revocation Letter, ECF No. 24.  Settlement discussions began in early December 2015, an agreement in principle was reached in April 2016, and after Altair was de-listed, the parties submitted a revised agreement in early 2017.  *See* ECF Nos. 24-28; Guber Decl. ¶¶ 12-16.

Objector contends that Plaintiffs have not conducted a factual investigation sufficient to support the proposed settlement.  Obj. Mem. 19.  Although no formal discovery was taken, Plaintiffs nonetheless updated their investigations through public filings, reviewed 1,600 pages of documents, and interviewed one of the Individual Defendants, Karen Werner, Altair's former chief financial officer.  Pls. Opp. 3-4, ECF No. 47; Second Guber Decl. ¶¶ 11-12, ECF No. 48.  In order to approve a settlement, the Court need not find that the parties engaged in extensive, formal discovery.  *See D'Amato*, 236 F.3d at 87 (holding that the district court did not abuse its discretion when it approved a settlement that involved "no formal discovery" but where "the parties had engaged in an extensive exchange of documents and other information").  Moreover,

6

voluminous discovery may have posed a substantial financial burden on Altair, which is at risk of insolvency. *See* Fairness Hr'g Tr. 6:2-8; Defs. Ltr. 4. Given the circumstances, the Court is satisfied that sufficient factual investigation has been made.

On these facts, the presumption of fairness attaches. *See Veeco Instruments Inc.*, 2007 WL 4115809, at *5.

III.   Substantive Fairness

In evaluating the substantive terms of the settlement, the Court's analysis is guided by the *Grinnell* factors: "(1) the reasonableness of the benefits achieved by the settlement in light of the potential recovery at trial; (2) the likelihood of success in light of the risks posed by continued litigation; (3) the likely duration and cost of continued litigation; and (4) any shareholder objections to the settlement." *Pfizer*, 780 F. Supp. 2d at 340 (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)).

A.   Benefits

The first and most important consideration is the benefit the settlement confers to the class. NEWBERG ON CLASS ACTIONS § 13:49 (5th ed.) ("The value of a settlement to the settling plaintiffs is the most important factor in the court's decision to approve or disapprove a settlement"). "When considering the benefits achieved by a settlement, courts must keep in mind that 'there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *AOL I*, 2006 WL 2572114, at *4 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

Here, the proposed settlement does not award a monetary sum to Plaintiffs, and instead imposes corporate governance reforms. *See generally* Am. Corp. Reforms; Guber Decl. ¶ 22;

Stipulation of Settlement at 12.  It is well settled that settlement in shareholder derivative actions may be non-monetary, imposing instead improvements in the company's corporate governance. *See, e.g.*, *AOL I*, 2006 WL 2572114, at *4 (approving a settlement that improved the company's internal controls and audits); *Mills v. Electric Auto Lite Co.*, 396 U.S. 375, 395 (1970) (recognizing that "a corporation may receive a 'substantial benefit' from a derivative suit . . . regardless of whether the benefit is pecuniary in nature"); *see also In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 480 (D.N.J. 2010) ("[S]hareholder derivative suits are far less likely to involve a monetary component than typical class action suits.").

The Court finds that the corporate reforms proposed by the settlement offer significant benefits to the class.  For instance, they improve director education, requiring Altair directors to annually attend one session on "conducting business in China," and requiring board members to annually attend twelve hours of "continuing education programs . . . designed for directors of companies."  Am. Corp. Reforms ¶¶ II.A, II.B.  The Court rejects Objector's contention that these education requirements are "meaningless," Obj. Mem. 12, because a director may choose the topic of his or her continuing education course or because a director's obligations may be excused if they pose an "undue burden," Am. Corp. Reforms ¶ II.B.

In addition, the settlement requires Altair to "maintain an Audit Committee," and the majority of the Committee's members must "have past employment experience in finance or accounting."  *Id.* ¶ IV.  Under the direction of the Audit Committee, Altair's leadership would also be required to develop:

> a list of policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with applicable accounting principles , and that receipts and expenditures of the company are being made only in accordance with

>authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on Altair's financial position and its financial statements.

*Id.* ¶ IV.B.  Indeed, Altair's failure to properly audit its subsidiaries is what precipitated the company to lose almost all of its value, which is among the complained-of harms in this lawsuit. Compl. ¶ 25.

Objector posits that these auditing reforms are worthless because the company "is already required to maintain an Audit Committee under its governance documents." Obj. Mem. 1, 14.  It is true that the reforms in the settlement are in some cases duplicative of Altair's current practices, given that Altair already has bylaws requiring an audit committee.  *See* Audit Comm. Charter, ECF No. 41-3.  Absent the settlement, however, Altair's Board or its shareholders would be free to change the company's bylaws and repeal the Audit Committee requirement. *See* Altair Bylaws art. IV, ECF No. 41-2 ("[T]he Board of Directors shall have the power to adopt, amend or repeal Bylaws for the Corporation.  Bylaws may also be adopted, amended or repealed by the stockholders by the affirmative vote of the holders of a majority of the shares of capital stock of the Corporation then entitled to vote.").  Because Altair is no longer publicly traded, it is not subject to the myriad statutes and regulations that mandate rigorous audit and other transparency requirements.  In the absence of such legal requirements, therefore, these settlement-imposed reforms offer a tangible benefit to Altair.  *Cf. In re Emerson Radio S'holder Derivative Litig.*, No. Civ. A. 3392, 2011 WL 1135006, at *5 (Del. Ch. Mar. 28, 2011) (evaluating benefits of corporate reforms and noting that reforms "duplicat[ive] [of] existing requirements of federal law and stock exchange listing standards" provide "continuing protection in the event [the company] changes its listing or delists").

Objector also contends that the Court should reject the settlement because it is "missing key governance reforms." Obj. Ltr. 3, ECF No. 57. Objector argues that "at a minimum," the settlement should "require Altair to seek relisting" on the NASDAQ stock exchange or should address the alleged lack of independence of the board. Obj. Mem. 17. Such arguments, however, reflect a "mere preference for a different resolution," which is not a ground to reject an otherwise reasonable settlement. *AOL I*, 2006 WL 2572114, at *6. Moreover, the reforms achieved here are not of the meaningless variety that have faced criticism in this district and others. *E.g.*, *Polar Int'l Brokerage Corp.*, 187 F.R.D. at 117 (rejecting a settlement that offered plaintiffs a report amounting to an assurance that the price they received is "not unfair"); *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718, 724 (7th Cir. 2016) (reversing approval of class settlement where it produced "worthless" supplemental disclosures).

Objector also complains that the release in the settlement agreement is overbroad. The Court disagrees. Here, the settlement releases claims, known and unknown, that "arise out of . . . the facts alleged in any and all complaints filed in this [a]ction." Stipulation of Settlement at 8-9. In the Second Circuit, class action settlements may waive unknown claims or claims not presented "when such claims arise out of the same factual predicate as settled class claims." *Wal-Mart Stores, Inc.*, 396 F.3d 96 at 108; *see also Donovan v. Rite Aid of New York Inc.*, No. 13 Civ. 2937, 2013 WL 6183136, at *4 (S.D.N.Y. Nov. 14, 2013) (noting that claims may be "validly released" where they "arise out of the same factual predicate as the settled conduct"). Because the release here waives those claims that "arise out of" the allegations in this case, it does not pose substantial overbreadth problems. And none of the cases cited by Objector on this point persuade the Court to the contrary; those cases criticized broad releases in the distinguishable context of disclosure cases. *See, e.g.*, *Walgreen Co.*, 832 F.3d at 724.

Accordingly, this factor weighs in favor of approving settlement.

B.     <u>Likelihood of Success</u>

Having determined that the settlement confers a significant benefit to the class, the Court now considers the likelihood of success in light of the risks posed by continued litigation. *Fab Universal Corp.*, 148 F. Supp. 3d at 281. Because this case settled early and "without the benefit of a fully developed record," the Court "must heed the Supreme Court's admonition not to 'decide the merits of the case or resolve unsettled legal questions.'" *AOL I*, 2006 WL 2572114, at *5 (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)). Rather, "the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *Id.* (quoting *In re Global Crossing*, 225 F.R.D. 436, 459 (2004)).

For Plaintiffs, success at trial is not guaranteed. "[S]hareholder derivative actions are notoriously difficult and unpredictable." *AOL I*, 2006 WL 2572114, at *3 (internal quotation marks omitted). At the outset, Plaintiffs would have to overcome their failure to make a demand on Altair before initiating the suit. Fairness Hr'g Tr. 15:24-16:7; *Fab Universal Corp.*, 148 F. Supp. 3d at 282 (noting that the demand issue is "an infamously uphill battle for plaintiffs."). Beyond this preliminary hurdle, Plaintiffs may encounter difficulty proving their state law claims. Plaintiffs allege a near total lack of internal controls and a failure of oversight at Altair, which is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Citigroup Inc. S'holder Derivative Litig*, 964 A.2d 106, 125 (Del. Ch. Feb. 24, 2009).

Even assuming Plaintiffs are successful, they would face obstacles collecting a judgment. First, many of the Individual Defendants are located in China. Pls. Mem. 13. And recovering against Altair itself may bankrupt an already faltering company, *see* Defs. Ltr. 4

11

(noting that Altair "remains" insolvent), a result that would only exacerbate the harm suffered by Plaintiffs.[3]  Accordingly, this factor weighs in favor of approving settlement.

### C. Duration and Cost of Continued Litigation

The third factor is the likely duration and cost of litigation.  *Fab Universal Corp*, 148 F. Supp. 3d at 282.  This case was filed three years ago.  If the Court were to reject the settlement and the case continued to litigation, resolution would not be quick or cheap.  As previously mentioned, this case involves numerous Individual Defendants who reside in China.  Plaintiffs represent that the costs and difficulty of serving and obtaining discovery from the Individual Defendants based abroad would be "monumental," Fairness Hr'g Tr. 15:4, and the Court has no reason to doubt their estimate.  Similar concerns animated approval of a class action settlement in *Fab Universal Corp*., where the court found that the "multiple claims against a number of defendants and complex fact patterns primarily concerning business conducted in China" made it reasonable to assume "that prosecution would likely necessitate a substantial amount of time and expense."  148 F. Supp. 3d at 282.  In contrast to protracted and costly litigation, however, settlement provides instant relief to Altair in the form of improved corporate governance.  *See AOL I*, 2006 WL 2572114, at *5.  This factor, therefore, also weighs in favor of settlement.

### D. Reaction to the Settlement

The final consideration is reaction to the settlement.  "The reaction of shareholders may be gauged by reference to the extent of objection to the settlement."  *AOL I*, 2006 WL 2572114,

---

[3] Even if Altair were in a better financial position, a substantial award from it would offer little tangible benefit to Plaintiffs.  *See* John C. Coffee, Jr., *Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation*, 106 COLUM. L. REV. 1534, 1538 (2006) (noting that the "central problem" of damages in shareholder derivative action context is that they are circular transfers of cash with high transaction costs that force the victim to "bear[] the costs of its own injury").

at *6.  "If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."  *Wal-Mart Stores, Inc.*, 396 F.3d at 118.  Here, only one shareholder objected to the settlement.  "The lack of substantial opposition weighs in favor of approving the settlement."  *Polar Int'l Brokerage Corp*, 187 F.R.D. at 113.  Accordingly, this factor, weighs in favor of approving settlement.

Accordingly, after weighing the *Grinnell* factors, the Court concludes that the settlement is fair, reasonable and adequate, and Plaintiffs' motion for settlement approval is GRANTED.

IV.     Attorneys' Fees and Expenses

Counsel for Plaintiffs request an award of fees and expenses of $150,000.  Lifshitz Decl. ¶¶ 6, 9; Guber Decl. ¶¶ 57, 74-83; Stipulation of Settlement at 16.  Plaintiffs' counsel collectively billed 371.70 hours of work, and Plaintiffs' counsel represents that the lodestar is $234,953.7, which results in a "negative" lodestar multiplier of 0.64.  Guber Decl. ¶ 82.  Plaintiffs' collective expenses total $4,674.71.  *Id.* ¶¶ 83-86.

Although litigants typically pay their own expenses, including their own attorneys' fees, "[t]here is a salient exception to this general rule that applies where an attorney succeeds in creating a common fund from which members of a class are compensated for a common injury." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).  In such a situation, the attorneys establishing the benefit for members of the class are entitled to a reasonable fee set by the court.  *Id.*

In the Second Circuit, there are two methods by which the Court calculates attorneys' fees: the "percentage-of-recovery" method and the "lodestar" method, now known as the "presumptively reasonable fee."  *In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302, 2010 WL 363113, at *5 (S.D.N.Y. Feb. 1, 2010) (*AOL II*).  However, the percentage

approach is impractical in cases involving non-monetary relief, "such as settlements for changes to corporate management procedures," because such non-monetary relief is difficult to quantify. NEWBERG ON CLASS ACTIONS § 13:49; *AOL II*, 2010 WL 363113, at *5 (holding that, because "the value of the stipulated corporate reforms will be recognized in major part in future profits, goodwill and avoidance of repeat litigation," quantification of the benefit of the corporate reforms in the settlement "would be speculative at best"). Thus, "the presumptively reasonable fee method, formerly known as 'lodestar,' emerges as the best practical and objective device to assess the worth of counsel's services in this case." *AOL II*, 2010 WL 363113, at *6. Regardless of the method used, the *Goldberger* factors inform the reasonableness of an attorney's fee. The factors include: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy." *Wal-Mart Stores, Inc.*, 396 F.3d at 121 (citing *Goldberger*, 209 F.3d at 50).

First, the Court looks to the time and labor expended by counsel. *Wal-Mart Stores, Inc.*, 396 F.3d at 121. Plaintiffs' counsel collectively devoted 371.7 hours to this litigation, incurring an aggregate fee, or lodestar of $234,953.75. Pls. Mem. 21; Guber Decl. ¶¶ 75, 82. Although counsel could have requested that a positive multiplier be applied to the lodestar "to account for the contingent nature of the engagement and the risk of such a case," *In re NTL Inc. Sec. Litig.*, No. 02 Civ. 3013, 2007 WL 1294377, at *8 (S.D.N.Y. May 2, 2007), Plaintiffs' counsel offer a negative lodestar, or a downward adjustment of their actual billable hours. A review of the attorney time records submitted to the court shows a significant amount of time devoted to drafting the complaint, reviewing documents, and engaging in settlement discussions. Time Entries, ECF 59-2. The Court finds such expenditures reasonable given the posture of the case

and the multiple rounds of settlement negotiations. Although the Court notes that some of the time entries were vague or duplicative, particularly those belonging to the Faruqi & Faruqi firm, *id.* at 2-4, any reduction of the fee in this case would be unnecessary in light of Plaintiffs' negative multiplier. *Cf. AOL II*, 2010 WL 363113, at *9 (reducing fee because of "vague service descriptions" and "repetitive entries").

The second *Goldberger* factor requires the Court to consider the complexities and magnitude of the litigation. *Wal-Mart Stores, Inc.*, 396 F.3d at 121. Although shareholder derivative cases are "notoriously difficult and unpredictable," *AOL I*, 2006 WL 2572114, at *3, the Court cannot say that the lawyering here was particularly complex, *see AOL II*, 2010 WL 363113, at *11 ("Derivative actions based on faulty corporate accounting practices are nothing new."). In particular, the case did not proceed past the filing of a complaint, and many, if not all, of the facts relating to the misstatements and omissions in the complaint were based on publicly available material. *See NTL Inc.*, 2007 WL 1294377, at *6 (reducing fee multiplier and noting that the case was not complex where plaintiffs relied on publicly available material). In addition, the claims were typical of those asserted in shareholder derivative suits. Nonetheless, proving the relevant facts would not have been straightforward and establishing liability is far from certain.

Third, the Court evaluates the risk of litigation. *Wal-Mart Stores, Inc.*, 396 F.3d at 121. "Courts of this Circuit have recognized the risk of litigation to be perhaps the foremost factor to be considered in determining the award of appropriate attorneys' fees." *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, No. 02 MDL 1484, 2007 WL 313474, at *16 (S.D.N.Y. Feb. 1, 2007) (internal quotation marks omitted). Where, as here, "claims were precipitated by public events, . . . the risk undertaken by class counsel is especially slight" because of the high

15

frequency at which securities and derivative class actions settle. *NTL Inc.*, 2007 WL 1294377, at *7. Accordingly, this factor counsels against the award of a large fee.

Fourth, "[t]o determine the quality of the representation, courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Taft v. Ackermans*, No. 02 Civ. 7951, 2007 WL 414493, at *10 (S.D.N.Y. Jan. 31, 2007) (internal quotation marks omitted). Although Plaintiffs' counsel have experience in shareholder derivative suits, Guber Decl. ¶ 68, the best indicator of the quality of the representation is the result achieved. Here, the suite of corporate reforms negotiated by counsel are a fine result; they help ameliorate the failures in control and auditing problems at Altair that led to the current litigation. *See Fab Universal Corp.*, 148 F. Supp. 3d at 284 ("Counsel have obtained significant benefits . . . in obtaining extensive corporate governance reforms in settlement that will help assure that the alleged conduct in this action does not recur . . . [and] therefore evidences that the quality of representation is high in this case.").

The fifth factor is the relationship of the fee to the settlement. Here, the settlement is non-pecuniary, making an apples-to-apples comparison of the settlement to the attorneys' fee impossible. Nevertheless, the Court has found that the settlement confers a substantial benefit to the class. And Plaintiffs' counsel have voluntarily reduced their billed fees by applying a negative lodestar and by having expenses and incentive awards deducted from their overall attorneys' fee. Once the negative lodestar is taken into account, counsel's effective billable rate falls from $632.11 to $403.55 per hour, which the Court finds reasonable. *See Capitol Records, Inc. v. MP3tunes, LLC*, No. 07 Civ. 9931, 2015 WL 7271565, at *4 (S.D.N.Y. Nov. 12, 2015) (noting that New York district courts have "recently approved rates for law firm associates in the range of $200 to $450 per hour" and approved partner rates "in the range of $500 to $800 per

hour"). In addition, the Court finds Plaintiffs' expenses reasonable. *In re Visa/Mastermony Antitrust Litig.*, 297 F. Supp. 3d 503, 525 (E.D.N.Y. 2013) (holding that courts should not depart from "the common practice in this Circuit of granting expense requests" and reimbursing counsel for $18 million in costs), *aff'd* 396 F.3d 96 (2d Cir. 2005). Accordingly, the Court finds the fee and expenses here are modest relative to the result achieved in this case.

Last, public policy considerations support the fee award. The purpose of shareholder derivative actions is to provide "the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Fab Universal Corp.*, 148 F. Supp. 3d at 284. Awarding fees to Plaintiffs' counsel here would help incentivize others to take on these kinds of cases, leading to greater enforcement of the nation's securities laws. *See Visa Check/Mastermoney*, 297 F. Supp. 2d at 524 (awarding attorneys' fees as an "inducement for lawyers to make similar efforts in the future").

Accordingly, after considering the *Goldberg* factors and in light of the circumstances of the case, Plaintiffs' motion for attorneys' fees is GRANTED.

V.     Incentive Award

Plaintiffs also request that the two named Plaintiffs, Cavaliere and Rauenbuehler, be provided an incentive award of $1,500 each. Guber Decl. ¶¶ 2, 8.

"An incentive award is meant to compensate the named plaintiff for any personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit." *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 124 (S.D.N.Y. 2001). Courts routinely award such sums as "an incentive for such plaintiffs to remain involved in the litigation." *Hicks v. Stanley*, No. 01 Civ. 10071, 2005 WL 2757792, at *10 (S.D.N.Y. Oct. 24, 2005). Incentive awards "need not be subjected to intense scrutiny" where they are deducted

from attorneys' fees, as opposed to siphoned from the common fund. *In re Presidential Life Sec.*, 857 F. Supp. 331, 337 (S.D.N.Y. 1994).

Here, the proposed incentive awards are to be deducted from counsel's fees, Guber Decl. ¶ 8, and they are modest. Courts in the Second Circuit routinely approve sums in the low thousands. *See, e.g.*, *Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 276 (E.D.N.Y. 2009) ("Given the minimal amount of the [$2,500] awards [and] the time and effort the Representative Plaintiffs expended in bringing this suit on behalf of the Class . . . the Court approves them."); *In re Top Tankers, Inc. Sec. Litig.*, No. 06 Civ. 13761, 2008 WL 2944620, at *18 (S.D.N.Y. July 31, 2008) (awarding $3,000 to lead plaintiff). The Court is satisfied that the incentive awards here are reasonable in light of the time and effort expended by Cavaliere and Rauenbuehler as well as the benefit of the settlement to the class as a whole.

Accordingly, Plaintiffs' motion for incentive awards is GRANTED.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion to approve the settlement and to award fees, expenses, and incentive awards is GRANTED. The Clerk of Court is directed to terminate the motion at ECF No. 33 and to close this case.

SO ORDERED.

Dated: October 4, 2017
    New York, New York

_____
ANALISA TORRES
United States District Judge